# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. CR 08-2897 RB |
| ) | |
| MATTHEW THYBERG, ) | |
| ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND ORDER DENYING MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant's Motion to Suppress Physical Evidence and Statements [Doc. 33], filed on August 10, 2009. The Court held an evidentiary hearing on August 27, 2009. Having considered the submissions of counsel, evidence adduced at the hearing, relevant law, and being otherwise fully advised, I issue these findings of fact and conclusions of law and deny Defendant's motion.

## FINDINGS OF FACT

1. The Indictment charges Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).

2. Defendant moves to suppress physical evidence, statements made by Defendant, and any evidence obtained as a result of information contained in those statements. As grounds, Defendant argues that (1) his initial detention was not justified at its inception and (2) the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

3. At the hearing, Roswell Police Department Officer Tim Rogers testified that, on July 18, 2008, he was wearing full uniform and driving a marked police unit on patrol duty in Roswell,

New Mexico. The weather was clear and sunny. At about 11:20 a.m., as he was leaving a call, Officer Rogers drove south on South Stanton Avenue. (*See* Government Ex. 1, Satellite Map of Area.)

4.     As he drove south on South Stanton Avenue, Officer Rogers noticed two individuals walking up the street. During his testimony, Officer Rogers denoted his location when he first noticed the two individuals as "R-1" and the two individuals' location when Officer Rogers first noticed them as "D-1" on Government's Exhibit 1.

5.     As Officer Rogers approached, he could see that the individuals were male and one was significantly taller than the other. The taller man wore dark colored clothing with a white object over his shoulder. As he continued to drive south on South Stanton Avenue, Officer Rogers could see that the two men were walking northbound on the northbound side of South Stanton Avenue. The taller one was wearing a black tank top and black sweat pants with a white shirt draped over his shoulder. The shorter man was wearing brown shorts and a white top.

6.     When the taller man saw Officer Rogers, he ducked into the north alley of East Van Buren Street, which Officer Rogers identified with an "A" on Government's Exhibit 1. The second man continued walking north on South Stanton Avenue. The second man was walking slowly. As Officer Rogers approached the intersection of East Summit Street on South Stanton Avenue, the taller man emerged from the alley, and walked at a fast pace in order to catch up to the second man. Officer Rogers had a clear view of the men across a vacant field at the northeast corner of South Stanton Avenue and East Summit Street.

7.     Officer Rogers continued south on South Stanton Avenue. As Officer Rogers drove slowly past the men in his marked police car, the taller man stared at Officer Rogers. After Officer Rogers passed the men, Officer Rogers saw in his rearview mirror that the taller man looked over

2

his left shoulder once or twice at Officer Rogers. The shorter man did not look at Officer Rogers.

8.    The taller man's behavior seemed odd to Officer Rogers. Officer Rogers knew that people often hang out at the house adjacent to the alley. At first, Officer Rogers surmised that the taller man may have ducked into the alley in order to contact someone outside the house or in the yard. However, as Officer Rogers drove past the house, he saw that no one was outside of the house or in the yard. There was a tree and a camper in the alley, which provided places to hide objects. The fact that the taller man ducked into and quickly emerged from the alley, combined with the fact that no one was at the house or in the yard, indicated that the man may have ducked into the alley in order to hide something. His suspicion piqued, Officer Rogers decided to drive around the block and have another look at the men.

9.    Officer Rogers continued south on South Stanton Avenue for a block south past East Van Buren Street, turned west on East Reed Street, turned north on Grand Avenue, turned east on East Van Buren Street, and took a left onto northbound South Stanton Avenue. Officer Rogers could not see the men for about 30 seconds while he looped around the block. During his testimony, Officer Rogers denoted his location at this point as "R-2" and the location of the two men as "D-2" on Government's Exhibit 1. Officer Rogers looped around the block as quickly as possible because he suspected that the taller man was going to return to the alley and pick up what he had hidden.

10.   As Officer Rogers turned onto South Stanton Avenue, Officer Rogers saw that the taller man had back tracked to the alley and was coming out of the alley. Officer Rogers did not see the shorter individual. The taller man was moving at a slow-paced jog north on South Stanton Avenue. When he saw Officer Rogers, the taller man picked up his pace. The taller man had his right hand on his right hip and his left arm across his body. The taller man jogged northbound to the intersection of East Summit Street and South Stanton Avenue, crossed East Summit Street,

3

proceeded north into the field at the intersection of South Stanton Avenue and East Summit Street. By this time, Officer Rogers had reached the stop sign at the intersection of South Stanton Avenue and East Summit Street. The man was fiddling with something on his hip. Officer Rogers saw a round or oblong black object fall to the ground. During his testimony, Officer Rogers denoted the location where the black object fell to the ground as "X" on Government Exhibit 1.

11. Officer Rogers saw the black object fall as Officer Rogers pulled up to the stop sign, which was about twenty to twenty-five feet away from the man, who was about fifteen feet into the field. The taller man continued across the field. Officer Rogers drove north on South Stanton Avenue. The subject changed direction. Officer Rogers had kept pace with the man as the man was in the field and stopped his police vehicle near where the man came out of the field. Officer Rogers activated neither the emergency lights nor the siren on the police car. During his testimony, Officer Rogers denoted the location where he stopped his police unit as a rectangle on Government Exhibit 1. Officer Rogers denoted the path taken by the taller man through the field with a red line.

12. The man came out of the field about 10 feet in front of Officer Rogers' police car. Officer Rogers exited his police unit. The man was walking back toward Officer Rogers a little bit. In a conversational tone, Officer Rogers asked the man to come over so Officer Rogers could talk to him. The man complied and walked the five to seven feet back to Officer Rogers. Officer Rogers asked the man for identification. The man produced an identification card issued by the New Mexico Department of Corrections that identified the man as Matthew Thyberg, the Defendant herein. At the hearing, Officer Rogers identified the taller man as the Defendant herein.

13. When Officer Rogers saw the New Mexico Corrections Department identification card, Officer Rogers realized that the man was probably a convicted felon. Up until the time he saw the name on the identification card, Officer Rogers had not recognized the man. However, when

Officer Rogers saw the name, Officer Rogers recognized Defendant as a convicted felon because Officer Rogers had worked on one of Defendant's prior criminal cases. Officer Rogers knew Defendant took a plea in the prior case that would have involved at least one felony. Officer Rogers had not met Defendant in person before July 18, 2008. Officer Rogers had investigated Defendant and prepared an affidavit in the prior felony case. Officer Rogers knew that another officer had arrested Defendant.

14. Officer Rogers asked Defendant if he had anything on him. Defendant responded that he had a "needle." Defendant reached into his left front pocket and pulled out a syringe. Officer Rogers asked Defendant to place the syringe on the hood of the police car. Defendant complied. Defendant was very sweaty and nervous. The temperature was about 75 to 80 degrees.

15. About the time Defendant produced the syringe, Officer Rogers turned on his digital belt recorder. Officer Rogers radioed dispatch to determine if Defendant had any outstanding warrants and also requested a second police unit for back up. Officer Rogers testified at the hearing that Government Exhibit 3 is an audio CD containing a fair and accurate copy of the recording of the conversation between Officer Rogers and Defendant captured on Officer Rogers' belt recorder at the scene and in the booking room on July 18, 2008. Government Exhibit 4 is a transcript of the recording. Officer Rogers testified at the hearing that the transcript is generally accurate. However, there are discrepancies on page 4, line 3, where they speak of "positive" drug test results. Officer Rogers testified that he used the term "hot" instead of "positive" during his conversation with Defendant. In addition, on page 11 at line 3, Officer Rogers states that the caller ID read "City of Roswell" and not "City of Clovis."

16. Officer Rogers was not sure what Defendant had dropped in the field. Officer Rogers suspected that Defendant might have dropped drugs because the syringe was the type

commonly used by drug users.  The presence of the syringe suggested Defendant had used it to inject drugs.

17.    Officer Rogers performed a pat down search of Defendant.  During the pat down, Officer Rogers asked Defendant what he dropped in the field.  Defendant stated, "nothing."  Officer Rogers asked where Defendant was headed.  Defendant responded that he was on his way to see his probation officer.  Officer Rogers and Defendant talked about the probation officer for a few seconds.  Officer Rogers again asked Defendant what he had dropped in the field.  Defendant said, "I need a break, I'm gonna get in trouble."

18.    In response to Officer Rogers' questions concerning what Defendant had dropped in the field, Defendant gave several answers.  First, Defendant's answer was "nothing."  Defendant subsequently stated that Defendant "was going to get in trouble."  Defendant also asked Officer Rogers to give Defendant a "break," which Officer Rogers interpreted as a request that Officer Rogers not charge Defendant with a crime.  Additionally, Defendant stated, "I'll tell you what is in the field if you let me go." In essence, Defendant was negotiating with Officer Rogers.

19.    At this point, no back up had arrived.  Officer Rogers asked Defendant to "do him a favor and have a seat in the car."  Officer Rogers and Defendant started walking to the back seat of the police car.  About two minutes had elapsed since the initiation of contact.  At Page 4, line 7 of Government Exhibit 4 Officer Rogers asked Defendant to sit in the police car.

20.    Officer Rogers told Defendant that Defendant was not under arrest.  Officer Rogers informed Defendant that Officer Rogers would give Defendant a break on the syringe. Officer Rogers was concerned about Defendant fleeing and/or posing a threat to Officer Rogers' safety. Officer Rogers did not pull his gun.  Other than the pat down search, Officer Rogers did not touch Defendant.  Officer Rogers did not yell at Defendant or threaten him in any way. The tone of both

Officer Rogers' and Defendant's speech throughout the encounter was conversational. Defendant's behavior was cooperative.

21.     Defendant sat down in the back seat of the police car. At first, Defendant had his feet outside the car, but then he voluntarily put his feet inside the police car. Because Defendant is a rather tall man, it was difficult for Defendant to get his legs into the back seat of the police car unless the door was fully open because the back seat of the police car is somewhat small.

22.     Officer Rogers told Defendant that he would give him a break on the syringe and asked Defendant to tell the truth as to what he had dropped in the field. After Defendant was seated in the backseat of the police unit with his legs inside, Defendant stated that he had dropped a small gun in the field. At this point, Officer Rogers was alone with Defendant. Officer Rogers did not see anyone else in the area except someone walking several blocks to the north on South Stanton Avenue. Officer Rogers shut the door to the police car, turned off his belt recorder, and went to check the field. The back door of the police car was inoperable from the inside. Defendant was locked in the backseat of the police car.

23.     Officer Rogers walked over to the field and located the gun. Officer Rogers testified that Government Exhibit 6 is a photograph of the gun, exactly how Officer Rogers found it, with seven rounds in the magazine. The gun was in plain view, lying on the ground amongst the weeds in the field. (Government's Exs. 5 and 6.) As Officer Rogers returned to his police car, Roswell Police Officer Garcia arrived on the scene in another police unit.

24.      Officer Rogers told Officer Garcia that Officer Rogers had not arrested Defendant. When Officer Rogers reached the police unit with Defendant inside, Officer Rogers opened the car door and asked Defendant to step out of the unit. Defendant stated, "I'm going to jail" and "I told the truth." Officer Rogers handcuffed Defendant. Officer Rogers told Defendant that he would call

Defendant's probation officer and inform him that Defendant had been very cooperative. Officer Rogers did not advise Defendant of his *Miranda* rights at any relevant time.

25.     Defendant asked to make a phone call. Officer Rogers offered to allow Defendant to use Officer Rogers' cell phone. Because Defendant was in handcuffs, Officer Rogers dialed the cell phone for Defendant and held the cell phone to Defendant's ear. They made one or two phone calls. Defendant was not sure of the last two numbers so they dialed both numbers. No one answered. Defendant sat back in the police car and Officer Rogers closed the door.

26.     Officer Rogers went back out to the field to photograph and retrieve the gun. When Officer Rogers returned to the police car, he drove Defendant to the police station, which was six to eight blocks from the field. Officer Garcia also drove his police car to the police station. It took a few seconds to drive from the field to the police station. The total time elapsed from the time that Officer Rogers first saw the two individuals until he handcuffed Defendant was ten to fifteen minutes. Approximately three minutes elapsed from the time that Officer Rogers first made contact with Defendant until the first time Officer Rogers closed the police car door, thereby locking Defendant in the back seat of the police car.

27.     When they arrived at the police station, Officer Rogers and Defendant proceeded to the booking room, where Officer Rogers took the handcuffs off Defendant. The booking room was about 10' by 20' and contained file cabinets, a computer, a land line telephone, and chairs. Officer Rogers activated his belt recorder while he obtained booking information from Defendant.

28.     While Officer Rogers prepared the paperwork, Defendant asked to use the land line. Officer Rogers gave Defendant permission to do so and informed him to dial nine for an outside line. Defendant retrieved the phone numbers from Officer Rogers' cell phone. Defendant spoke on the telephone in a normal tone of voice and informed the persons on the line that Defendant was

at the police station, he had been caught with the gun, and he tried to tell them what his bond was.

29. Officer Rogers noticed that Defendant was favoring his right side. Defendant stated to Officer Rogers that he had been jumped a few days prior by several black guys and Defendant was carrying the gun to protect himself. After the booking process was complete and Officer Rogers obtained clearance from his supervisor, Officer Rogers transported Defendant to the hospital to have him looked at by medical personnel.

## CONCLUSIONS OF LAW

1. In the title of his motion, Defendant indicates that he seeks to suppress physical evidence, *i.e.*, the gun, as well as his statements linking him to the gun. However, Defendant has offered no argument with respect to suppression of the gun. In any event, Defendant lacks standing to challenge the admissibility of the gun. The Fourth Amendment prohibits unreasonable searches and seizures by the government. U.S. Const. amend. IV. "[T]he threshold issue of Fourth Amendment standing, whether the search in question violated the rights of the defendant seeking to exclude evidence, must first be addressed in deciding a motion to suppress." *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1179 (10th Cir. 1995) (citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). "Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search . . . of property which has been abandoned." *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997).

2. The burden is on the United States to establish abandonment by a preponderance of the evidence. *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006). A defendant abandons evidence if he discards it during a period of non-seizure. *See California v. Hodari D.*, 499 U.S. 621, 623-24 (1991). Defendant was not seized at the time he dropped the gun in the field. *See Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994). By dropping the gun, moving away from it, and

9

leaving it in the field, Defendant abandoned the gun.

3. "The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object." *Garzon*, 119 F.3d at 1449 (internal quotation omitted). The Tenth Circuit has held that the physical act of discarding a knapsack onto public property, while being chased by the police, constituted abandonment. *United States v. Jones*, 707 F.2d 1169, 1172-73 (10th Cir. 1983). Similar to the facts in *Jones*, Defendant herein abandoned the gun when he dropped it in the field and continued moving across the field.

4. Of course, a defendant's abandonment of property must be voluntary. *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). While "[p]olice pursuit or investigation at the time of abandonment of property . . . does not of itself render abandonment involuntary," abandonment is involuntary if it results from a violation of the Fourth Amendment. *Hernandez*, 7 F.3d at 947. In this case, as discussed more fully *infra* at ¶¶ 7-10, Defendant's dropping and leaving the gun did not result from a Fourth Amendment violation. Defendant's actions in discarding the gun were voluntary.

5. The Tenth Circuit has explained:

This test for abandonment subsumes both a subjective and an objective component. Findings of subjective intent are findings of fact which we review only under a clearly erroneous standard. However, a determination of whether the defendant retained an objectively reasonable expectation of privacy in the property that society will recognize is a question of law that we review de novo.

*Garzon*, 119 F.3d at 1449.

6. Defendant dropped the gun and proceeded across and out of the field. In so doing, Defendant undoubtedly intended to abandon the gun. Under these circumstances, Defendant did not maintain an objectively reasonable expectation of privacy in the gun. The United States has satisfied its burden of establishing abandonment by a preponderance of the evidence. Because Defendant

abandoned the gun, Defendant lacks standing to challenge the seizure of the gun.

7.      In support of his motion to suppress his statements, Defendant argues that Officer Rogers lacked reasonable suspicion that he was involved in criminal activity when Officer Rogers initially detained Defendant.  A police officer may stop an individual in the absence of probable cause so long as the officer is "able to point to specific and articulable facts" which lead the officer to believe the individual might be involved in a criminal deed.  *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).  Under *Terry*, "[a] lawful investigative detention of limited scope and duration does not require probable cause as long as the police officer has reasonable suspicion that the person seized is engaged in criminal activity."  *United States v. Dennison*, 410 F.3d 1203, 1207 (10th Cir. 2005).

8.      In determining whether reasonable suspicion existed, the Court must take into account the totality of circumstances, "consider[ing] whether the facts as a whole 'amount to reasonable suspicion,' " even where "each separate fact or observation . . . 'is not by itself proof of any illegal conduct.' " *Dennison*, 410 F.3d at 1208 (*quoting United States v. Sokolow*, 490 U.S. 1, 8 (1989)).  The officer's conduct must be assessed "through a filter of common sense and ordinary human experience." *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007).  The facts of this case are more than sufficient to support a finding of reasonable suspicion.

9.      Officer Rogers observed Defendant leave his companion and duck into an alley after the marked police car came within his view.  As Officer Rogers approached, Defendant emerged from the alley and walked at a fast pace in order to catch up to his companion. As Officer Rogers drove slowly past Defendant in a marked police car, Defendant stared at Officer Rogers.  After Officer Rogers passed the men, Officer Rogers saw in his rearview mirror that Defendant looked over his left shoulder once or twice at Officer Rogers.  The other man did not look at Officer Rogers.  As Officer Rogers drove past the house adjacent to the alley, no one was outside.  The fact that

Defendant ducked into and quickly emerged from the alley, combined with the fact that no one was at the house or in the yard, indicated that Defendant may have ducked into the alley in order to hide something illegal.

10. Within the thirty seconds it took for Officer Rogers to loop around the block, Defendant had back tracked and was in the process of re-emerging from the alley. This suggested that Defendant went back to retrieve contraband, or other illegal objects, when he thought Officer Rogers had left the area. Defendant, who was jogging slowly northbound, picked up his pace when he saw Officer Rogers had returned. Defendant had his right hand on his right hip and his left arm across his body. Defendant jogged into the field and fiddled with something on his hip. Officer Rogers saw a round or oblong black object fall to the ground.

11. Officer Rogers' observations of Defendant's actions provided a particularized and objective basis for suspecting legal wrongdoing. The facts gave rise to reasonable suspicion that Defendant was engaged in criminal activity. Indeed, no reasonable law enforcement officer could have ignored the suspicious circumstances raised by Defendant's behavior. At the time of the initial encounter, as Defendant came out of the field, the stop was supported by reasonable suspicion, under the totality of the circumstances.

12. In response to Officer Rogers' request for identification, Defendant produced an identification card issued by the New Mexico Department of Corrections that identified him. This fact alone indicated that Defendant was a convicted felon. When Officer Rogers saw Defendant's name, Officer Rogers recognized Defendant as a convicted felon whom Officer Rogers had investigated.

13. When Officer Rogers asked Defendant if he had anything on him, Defendant produced a syringe, which was consistent with illegal drug use. The presence of the syringe

suggested Defendant was involved with illegal drugs. At this point, Officer Rogers had reason to believe that Defendant posed a threat to officer safety. *See United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir. 2000) (holding that a reasonable suspicion that the defendant "was distributing drugs . . . also indicated that he might be armed and dangerous" based on the connection between drug trafficking and weapons); *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006) ("[A] connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous."); *United States v. Johnson*, 364 F.3d 1185, 1194-95 (10th Cir. 2004) (recognizing drug dealing is a crime "typically associated with some sort of weapon, often guns"). Additionally, the syringe gave rise to probable cause that Defendant had committed a drug crime.

14. Officer Rogers asked Defendant what he had dropped in the field and Defendant gave evasive and non-responsive answers. Questioning as to what Defendant had dropped was crucial for Officer Rogers to dispel or confirm his suspicions of criminal activity. *See*, *e.g.*, *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) ("Officers may ask the detained individual questions during the *Terry* stop in order to dispel or confirm their suspicions"). It bears underscoring that police officers "are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.' " *Perdue*, 8 F.3d at 1462 (*quoting United States v. Hensley*, 469 U.S. 221, 235 (1985)). For public safety purposes, it was imperative for Officer Rogers to determine what Defendant had dropped in the field. Any reasonable law enforcement officer would have been remiss in his duty had he left potential contraband in an open field.

15. During a *Terry* stop, an officer "may conduct a pat-down search (or 'frisk') if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Maddox*, 388 F.3d 1356, 1361 (10th Cir. 2004). But, notably, "a search which is

reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18. With respect to the permissible scope of a *Terry* stop, the Tenth Circuit has recently stated that: "There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather [the court's] evaluation is guided by common sense and ordinary human experience." *United States v. Albert*, ____ F.3d ___, 2009 WL 2757038, *3 (10th Cir., Sept. 1, 2009) (*quoting United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994) (quotations omitted). Courts should avoid "unrealistic second-guessing of police officers' decisions in this regard"; law enforcement officers are not required "to use the least intrusive means in the course of a detention, only reasonable ones." *Melendez-Garcia*, 28 F.3d at 1052.

16. Law enforcement officers are "often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). In measuring the actions of a police officer under the Fourth Amendment, a court must "look at the objective facts, not the officer's state of mind." *United States v. Neff*, 300 F.3d 1217, 1222 (10th Cir. 2002). As noted supra at ¶ 13, the syringe indicated that Defendant was involved with illegal drugs which, in turn, gave rise to an inference that Defendant might be armed and dangerous. *Hishaw*, 235 F.3d at 570. Moreover, Defendant's suspicious behavior in ducking in and out of the alley suggested that he had something to hide. These circumstances would cause a reasonable officer to believe that Defendant posed a potential threat to officer safety. The pat down search was proper.

17. "Reasonableness . . . depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1305 (10th Cir. 2006). Contributing to the calculus

was the fact that Defendant was very sweaty and nervous. Officer Rogers was not sure what Defendant had dropped in the field. Officer Rogers suspected that Defendant might have dropped drugs because the syringe was the type commonly used by drug users. A reasonable officer would believe that Defendant was armed and dangerous.

18.     The Tenth Circuit has endorsed the restraint of suspects during *Terry* stops under circumstances similar to those presented herein. *See Albert*, ___ F.3d at ___, 2009 WL 2757038 * 4 (use of handcuffs during *Terry* stop approved where the police had discovered a controlled substance and had knowledge of two outstanding warrants for the unlicensed driver); *Neff*, 300 F.3d at 1221 (use of handcuffs during a brief investigative detention held reasonable where the police encountered a suspect believed to be carrying a dangerous concealed weapon); *Perdue*, 8 F.3d at 1463 (use of firearms and handcuffs reasonable where police encountered a suspect believed to be armed and dangerous).

19.     When combined with the suspicious behavior, the felony record, the evasive answers, the totality of the circumstances gave rise to reasonable suspicion that criminal activity was afoot. An experienced officer, such as Officer Rogers, taking into account the totality of the circumstances, including the factors mentioned above, would reasonably suspect that Defendant was armed and presently dangerous. Officer Rogers was justified in conducting the pat-down search and detaining Defendant in the police car while he ascertained what Defendant had dropped in the field.

20.     Defendant argues that his statements concerning the gun were obtained in violation of *Miranda*. It is well established that *Miranda* warnings are required only when law enforcement conducts a "custodial interrogation." *See United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). Whether a person is in custody for *Miranda* purposes depends on the type of encounter with the police. *Id*. Of the three types of police-citizen encounters - voluntary cooperation, investigatory

detention under *Terry*, and formal arrest - *Miranda's* custody element is triggered only in situations associated with a formal arrest. *Id*. In other words, "[c]ase law is well established that a defendant is not in custody under either of the first two encounters and therefore *Miranda* warnings need not usually be given." *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993). (*citing Berkemer v. McCarty*, 468 U.S. 420, 437-40 (1984)).

21.     "It is settled that the safeguards prescribed by *Miranda* become applicable [only when] a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " *Berkemer*, 468 U.S. at 440 (*quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "Thus, *Miranda* rights need only be given to a suspect at the moment that the suspect is in custody and the questioning meets the legal definition of interrogation." *Jones*, 523 F.3d at 1239. A suspect is "in custody" only when his freedom is "curtailed to a degree associated with formal arrest." *Id.* Therefore, using an objective analysis, this Court must "determine whether a reasonable person in the suspect's situation would have understood the situation as the functional equivalent of formal arrest." *Id.*

22.     In this case, Defendant was not subject to a formal arrest until Officer Rogers closed the police car door. Up to, and including the time Defendant stated that he had dropped a small gun in the field, Defendant was subject to a valid *Terry* stop. Generally, " *Miranda* warnings are . . . not implicated in the context of a valid *Terry* stop." *United States v. Perdue*, 8 F.3d at 1464. Therefore, *Miranda* warnings were unnecessary at any time before Officer Rogers closed the police car door because Defendant was detained pursuant to *Terry*.

23.     In *Perdue*, the Tenth Circuit recognized a limited exception to this general rule, holding that police officers must advise suspects of their constitutional rights, even in the context of a *Terry* stop, "if they . . . take highly intrusive steps to protect themselves from danger." *Id.* at

16

1465. The exception discussed in *Perdue* is inapplicable here. In this case, the *Terry* stop lasted less than three minutes. Officer Rogers was the only officer on the scene during the *Terry* stop. Officer Rogers did not draw his weapon or threaten Defendant in any way. The *Terry* stop occurred in the middle of a residential neighborhood just before noon. Under these circumstances, it was not necessary for Officer Rogers to administer *Miranda* warnings during the *Terry* stop. Defendant's statement that he dropped a small gun in the field was not obtained in violation of *Miranda*.

24.     Defendant asserts that the statements he made on the telephone in the booking room to third parties and overheard by Officer Rogers were obtained in violation of *Miranda*. Defendant was in custody at the time he used the telephone in the booking room. It would have been preferable if Officer Rogers had given Defendant *Miranda* warnings when he handcuffed him. However, the fact that Officer Rogers did not give Defendant *Miranda* warnings does not render the booking room statements inadmissible.

25.     The Court has emphasized that *Miranda* does not prevent the use as evidence of every statement made by an individual in police custody. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). On the contrary, *Miranda* warnings are required when a suspect is subjected to custodial interrogation. *Id.* The Court in *Miranda* referred to "interrogation" as actual "questioning initiated by law enforcement officers." *Innis*, 446 U.S. at 298. The Court in *Innis* clarified that those safeguards extended not only to express questioning, but also to "its functional equivalent." *Id.* The Court defined the phrase "functional equivalent" of express questioning to include:

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Innis*, 446 U.S. at 301.

26. The Court elaborated:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege [against self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.

*Id.* at 299-300. Notably, the Court concluded that " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300.

27. In this case, the booking room statements were not obtained in violation of *Miranda*. Although Defendant was in custody, the statements were not elicited by interrogation. *See United States v. Gay*, 774 F.2d 368, 379 (10th Cir. 1985) (*citing Innis*, 446 U.S. at 301). It is material that Defendant knew that Officer Rogers was present in the room and could hear Defendant's statements to third parties on the telephone. Defendant's statements were voluntary and spontaneous and were not made in response to words or actions by Officer Rogers that were "reasonably likely to elicit an incriminating response." *Gay,* 774 F.2d at 379. For this reason, the statements that Defendant made to third parties on the telephone in the booking room are not subject to *Miranda*. Put simply, the statements were not obtained in violation of *Miranda*.

28. Defendant's initial detention was justified at its inception and in its scope and the statements were not obtained in violation of *Miranda*.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Physical Evidence and Statements [Doc. 33], filed on August 10, 2009, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**